UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SHERRY L. MUSICK,                       )
                                        )
              Plaintiff,                )
                                        )
       v.                               )          Civil Action No. 02-1801 (PLF)
                                        )
KEN SALAZAR, Secretary,                 )
U.S. Department of the Interior,        )
                                        )
              Defendant.[1]             )
                                        )
_____ )

OPINION

        This matter is before the Court on defendant's motion for reconsideration of the

Court's October 24, 2007 Order denying defendant's motion for summary judgment.  Upon

consideration of the parties' papers, the relevant legal authorities, and the entire record in this

case, the Court will grant defendant's motion for reconsideration, will vacate the Court's Order

denying defendant's motion for summary judgment, and will grant defendant's motion for

summary judgment on the only count of plaintiff's complaint.[2]

---

[1]      The Court has substituted as the defendant Ken Salazar, the current Secretary of
the Interior, for former Secretary Dirk Kempthorne under Rule 25(d) of the Federal Rules of
Civil Procedure.

[2]      The papers reviewed in connection with the pending motion include: plaintiff's
complaint ("Compl.") [Dkt. No. 1]; defendant's motion for summary judgment ("MSJ") and
statement of material facts to which there is no genuine dispute ("Def. SMF") [Dkt. No. 37];
plaintiff's opposition to defendant's motion for summary judgment ("MSJ Opp.") and statement
of genuine issues in dispute ("Pl. SMF") [Dkt. No. 40]; defendant's reply to plaintiff's opposition
to defendant's motion for summary judgment ("MSJ Reply") [Dkt. No. 43]; defendant's motion
for reconsideration ("Recons. Mot.") [Dkt. No. 59]; plaintiff's opposition to defendant's motion
for reconsideration ("Recons. Opp.") [Dkt. No. 64]; and defendant's reply in further support of
his motion for reconsideration ("Recons. Reply") [Dkt. No. 68].

## I. BACKGROUND

Plaintiff Sherry L. Musick has brought this lawsuit against the Secretary of the United States Department of the Interior in his official capacity, alleging that the Department of the Interior retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.  Ms. Musick alleges that she was removed from federal service for engaging in activity protected by Title VII, that is, for "fil[ling] numerous complaints of discrimination against" the Department.  Compl. at 1.  The Department sees it differently: it contends that Ms. Musick was dismissed as an employee because she made statements of violence threatening various Department officials.

The history of this case begins more than 22 years ago.  Ms. Musick was hired by the United States Bureau of Mines, a former division of the Department of the Interior, in 1990.  See MSJ at 2; see also Def. SMF ¶ 1.  She remained there for six years until her transfer to the United States Geological Survey ("USGS"), another division of the Department of the Interior, on January 26, 1996.  Def. SMF ¶ 7.

Ms. Musick's time at Interior included many employment disputes.  The Department alleges that on several occasions Ms. Musick displayed "inappropriate, disruptive behavior towards her supervisors."  MSJ at 2.  The Department asserts that in April of 1994 Ms. Musick received a letter of reprimand for "rude and disruptive behavior (yelling)[.]"  Def. SMF ¶ 2.  One month later, Ms. Musick was suspended for five days without pay for "rude and disruptive behavior" and "false, malicious, and highly irresponsible statements," id. ¶ 4; two months after that suspension, Ms. Musick was again suspended, this time for 10 days, "for rude

and disruptive behavior and for false, malicious, and highly irresponsible statements against her supervisor." Id. ¶ 5.

Ms. Musick had her own share of complaints about the Interior Department. She filed numerous EEO complaints against various Department officials, alleging sex discrimination and sexual harassment. See Compl. ¶¶ 8-9. Ms. Musick claims that her EEO filings became so prolific that, at its high point, her filing rate averaged one complaint per month, see MSJ Opp. at 4, eventually culminating in a separate lawsuit before another judge of this Court, filed on January 21, 1997. See id. at 3; see also generally Musick v. Norton, Civil Action No. 97-0143 (D.D.C.).[3] Ms. Musick voluntarily dismissed that suit with prejudice on September 24, 2002. See Musick v. Norton, Civil Action No. 97-0143, Order at 1 (D.D.C. Sep. 24, 2002).

The events giving rise to this case arose while that prior lawsuit was pending. On May 1, 2001, Ms. Musick, while off-duty, encountered Barbara Mosgrave, a retired Interior Department employee, waiting in line at the Merrifield Post Office in Virginia. See MSJ at 3; Def. SMF ¶ 11; MSJ Opp. at 4-5. Their meeting was a chance encounter, and it is undisputed that Ms. Musick and Ms. Mosgrave had a conversation. See Def. SMF ¶ 11; MSJ Opp. at 4; see also Recons. Mot. at 4 n.2. The substance of the conversation is disputed: Ms. Mosgrave says that Ms. Musick threatened violence against various Department employees; Ms. Musick denies that she made any such statements. Compare Def. SMF ¶¶ 11-15, with MSJ Opp. at 4-5.

Specifically, Ms. Mosgrave says that Ms. Musick made threatening statements of violence against her first-line supervisor, Keith Harris, and at least two other Department of

---

[3]     The record suggests — and Ms. Musick does not dispute — that she did not submit an EEO complaint from 1999 until her termination related to this case in 2001.

Interior employees.  See Def. SMF ¶ 14; see also MSJ, Ex. 22 at 8-9, Affidavit of Barbara

Mosgrave ("Mosgrave Aff.").[4]  According to Ms. Mosgrave, Ms. Musick said that she wanted to

see these employees "blown up and in their grave."  Mosgrave Aff. at 8.  As Ms. Mosgrave

describes it, Ms. Musick was agitated when she made this statement, and then repeated this

statement over ten times.  See id. at 12.  Ms. Mosgrave was alarmed by Ms. Musick's statements,

and, at the end of the conversation, Ms. Mosgrave called her former supervisor at the

Department, Michael Kaas, to inform him about what Ms. Musick had said.  See Def. SMF ¶ 15;

Mosgrave Aff. at 14.

   Mr. Kaas then contacted Ms. Musick's first-line supervisor, Mr. Harris, and

informed him about the alleged statements of violence.  See Def. SMF ¶ 16.  Mr. Harris reported

the incident to his first-line supervisor — and Ms. Musick's second-line supervisor — John

DeYoung.  See id. ¶ 17; see also MSJ, Ex. 25 at 9, Affidavit of John DeYoung ("DeYoung

Aff.").  Interior Department officials then contacted Ms. Mosgrave to learn more about Ms.

Musick's alleged statements, see, e.g., Def. SMF ¶¶ 21, 23, and Department officials agreed that

Ms. Musick should be placed on administrative leave pending an investigation of the incident;

Ms. Musick was placed on administrative leave on May 3, 2001.  Def. SMF ¶ 22; see DeYoung

Aff. at 9-10.

   Mr. DeYoung conducted a preliminary investigation into Ms. Musick's alleged

threatening statements.  See Def. Stmt. ¶¶ 23-31.  As part of his investigation, Mr. DeYoung met

---

   [4]  The parties refer to the transcripts of the interviews conducted under oath during
the Equal Employment Opportunity investigation of Ms. Musick's termination as "affidavits."
Although these documents do not resemble typical affidavits, and are more akin to depositions,
the Court will refer to these documents as affidavits for purposes of consistency with the parties'
papers.

with Ms. Mosgrave and also obtained a statement from Mr. Kaas about the initial conversation he had with Ms. Mosgrave.  Id. ¶¶ 23, 26.  Mr. DeYoung also obtained statements from those who were the subject of Ms. Musick's alleged threats.  Id. ¶¶ 24-25.  The employees that Ms. Musick allegedly threatened said that, as a result of Ms. Musick's statements, they felt unsafe in the workplace.  Id. ¶¶ 27-29.

Ms. Musick asserts in her papers — but without a supporting affidavit or declaration — that Mr. DeYoung did not interview or otherwise talk with her.  MSJ Opp. at 8 (citing DeYoung Aff. at 55).  Mr. DeYoung acknowledges that he did not formally interview Ms. Musick, but he asserts that he did have a brief discussion with her after placing her on administrative leave, during which there "certainly was an exchange of views where [he] told her what the situation was, she recounted to [him], and [they] had a brief discussion on the issue." DeYoung Aff. at 54; see id. at 55.  Consequently, Ms. Musick's unsupported assertion notwithstanding, it is undisputed that Mr. DeYoung *did* in fact talk with Ms. Musick about the alleged incident.  See DeYoung Aff. at 54-55.  As Mr. DeYoung states, during this conversation Ms. Musick denied that she had made any statements of violence.  See id.; see also MSJ, Ex. 24 at 9, Affidavit of Cathy Skelton ("Skelton Aff.") ("During the issuance of the administrative leave letter, [Ms. Musick] indicated that she would never have made comments of that nature[.]").

In June 2001, after consulting the Department's Workplace Violence Handbook and other policies governing the discipline of employees, Mr. DeYoung proposed that termination was the proper course of action: Ms. Musick's misconduct, Mr. DeYoung concluded, was sufficiently serious in his judgment to initiate termination proceedings.  See Def. SMF

¶¶ 31-32.  Mr. DeYoung issued Ms. Musick a letter of proposed termination on June 13, 2001.
See id. ¶ 31.

Mr. DeYoung's proposal to terminate Ms. Musick was sent to Dr. David Russ,
Ms. Musick's third-line supervisor, for a final decision on the matter.  See Def. SMF ¶ 34.  Dr.
Russ then conducted his own investigation.  See id. ¶¶ 34, 35, 37.  In addition to reviewing Mr.
DeYoung's findings, Dr. Russ conducted separate interviews of Ms. Mosgrave, Mr. DeYoung,
and Mr. Kaas.  See id. ¶¶ 34-35; see also MSJ, Ex. 26 at 10-15, Affidavit of Dr. David Russ
("Russ Aff.").  And Dr. Russ considered statements given by the employees that Ms. Musick
allegedly threatened.  See Russ Aff. at 12-15.

Dr. Russ asserts that on September 4, 2001 he met with both Ms. Musick and her
attorney at the time, Solaman Lippman, and that he gave Ms. Musick an opportunity to speak on
her own behalf.  See Russ Aff. at 14-15.  Although Ms. Musick has claimed that no Department
officials talked to her during the investigation of the May 1, 2001 incident, see MSJ Opp. at 8;
MSJ, Ex. 23 at 40-41, Affidavit of Sherry Musick ("Musick Aff") — presumably including Dr.
Russ — she has not been consistent on the matter.  See MSJ, Ex. 30 at 110, Deposition of Sherry
Musick, Mar. 10, 2004 ("3/10/04 Musick Dep.") ("I talked to Dave Russ on September 5th of
2001. . . . [He] asked me if I'd made violent threats against my supervisors at USGS and I said
no."); MSJ, Ex. 31 at 13, Deposition of Sherry Musick, July 7, 2004 ("7/4/04 Musick Dep.")
("Q: Do you recall meeting with Mr. [sic] Ross?  A: Yes.  Q: When did you meet with Mr. [sic]
Ross?  A: I believe it was on September 5th of 2001."); 7/4/10 Musick Dep. at 36; see also supra
at 5 (discussing Ms. Musick's brief talk with Mr. DeYoung).  Moreover, in her most recent
filing, Ms. Musick expressly acknowledges that she and Mr. Lippman in fact did attend a hearing

6

conducted by Dr. Russ, and that she was interviewed at that hearing.  See Recons. Opp. at 29

("Sept. 2001, Mr. Lippman and Plaintiff attended a hearing conducted by Dave Russ and Cathy

Skelton . . . . Plaintiff was interviewed in the hearing."); see also id. at 36 (Ms. Musick, providing

a timeline of events, stating: "September 5, 2011, Plaintiff's meeting with Dave Russ at

USGS.").  Furthermore, it is undisputed that prior to her termination Ms. Musick and her

attorney provided Dr. Russ with a written response in support of their position that she should

not be terminated because she did not make any threatening statements, and that Dr. Russ

reviewed and considered that written response.  See Def. SMF ¶ 34;  Russ Aff. at 10-11, 14-16;

Musick Aff. at 41.

Ultimately, Dr. Russ determined that Ms. Mosgrave's report of the May 1, 2001

incident was credible.  See Russ Aff. at 19.  That determination was based, in part, on Ms.

Mosgrave's "sincere, credible presentation," id. at 45, her "clear" and "consistent" description of

the events in question, id. at 46, and Dr. Russ' conclusion that Ms. Mosgrave did not appear to

have any reason for reporting Ms. Musick's statements other than her sincere concern about the

nature of Ms. Musick's statements.  Id. at 45-47.  And having reviewed all of the evidence of his

investigation, Dr. Russ determined that Ms. Musick did make the statements of violence, and he

decided that removal was the appropriate sanction.  See Def. SMF ¶¶ 37-38.  He wrote a

five-page, single-spaced letter to Ms. Musick summarizing his investigation and conclusion and

terminating Ms. Musick's employment with the Department effective December 7, 2001.  See

MSJ, Ex. 19 at 4, Letter from D. Russ to S. Musick, Dec. 5, 2001.

In response, Ms. Musick filed a formal complaint of discrimination with the

Interior Department's Office of Equal Employment Opportunity about her removal from the

Department.  Compl. ¶ 2.  The EEO office conducted an investigation and then issued a final

agency decision on August 14, 2002, id., concluding that Ms. Musick's removal was not the

result of discrimination or reprisal.  See Def. SMF ¶ 41.  This lawsuit followed.

     Ms. Musick filed her complaint with this Court on September 11, 2002, alleging

one count of retaliation under Title VII.  See Compl. ¶¶ 22-26.  After settlement negotiations

failed and discovery began, the Department moved for summary judgment.  The Court denied the

Department's motion by Order dated October 24, 2007, finding that there were genuine issues of

material fact in dispute, and that the Department was not entitled to judgment as a matter of law.

See Order at 1, Oct. 24, 2007 [Dkt. No. 44].  Soon thereafter, the Court referred the parties to

mediation.

     Mediation failed, and the Court directed the parties to prepare for trial, set to

begin on May 24, 2010.  The parties then submitted trial briefs, pretrial statements, and proposed

jury instructions.  But just before the beginning of trial, on May 14, 2010, Ms. Musick's counsel

requested that the Court postpone the pretrial and trial dates because he had been selected for a

jury in a murder trial in the Superior Court of the District of Columbia.  See Consent Mot. for

Enlargement of Time at 1, May 14, 2010 [Dkt. No. 57].  The Department did not oppose the

motion, and the Court granted it on May 18, 2010, vacating the prior pretrial and trial dates and

setting trial for December 2010.

     The following day, on May 19, 2010, the Department moved for reconsideration

of the Court's Order denying the Department's motion for summary judgment.  Ms. Musick

failed to respond.  Almost two months later, on July 12, 2010, the Department asked the Court to

treat its motion for reconsideration as conceded.  The Court then ordered Ms. Musick to show

cause by August 18, 2010 why the Department's motions should not be granted.

On August 18, 2010, counsel for Ms. Musick filed a response, asserting that he

had been unable to obtain Ms. Musick's cooperation and collaboration in order to properly

respond to the Department's two motions.  See Response to Order to Show Cause at 1, Aug. 18,

2010 [Dkt. No. 61].  Ms. Musick's counsel further explained:

> Plaintiff was provided with a copy of the Motion for
> Reconsideration and she indicated that she would discuss it with
> counsel but there has been no communication from Plaintiff since
> that time.  Lacking that communication counsel is unable to take a
> position on the pending motion for reconsideration and on the
> pending motion to "consider as conceded".  Inasmuch as the
> Plaintiff resides in Wichita, Kansas and has been ill in the past
> counsel has no knowledge of her current physical condition or the
> reasons for which she is not communicating but suspects it may be
> a physical infirmity.  Accordingly counsel urges the Court to
> consider that the Plaintiff may [be] too ill to adequately participate
> in the prosecution of her cause.

Id. at 1-2.

Despite Ms. Musick's failure to respond to the Department's motions by August

18, 2010, the Court provided Ms. Musick with another opportunity to prosecute her case.  On

August 30, 2010, the Court ordered that "plaintiff personally or through counsel must respond to

the two pending motions on or before September 20, 2010 or face the consequences.  Plaintiff or

her counsel shall also affirmatively state whether or not plaintiff wishes to further pursue this

case."  Order at 2, Aug. 30, 2010 [Dkt. No. 62].

In response, on September 24, 2010, Ms. Musick, through counsel, filed an

opposition to the Department's motion for reconsideration, consisting primarily of a 121-page,

unsworn statement from Ms. Musick herself ranging on a variety of topics both relevant and irrelevant to this case.  See generally Resons. Opp., Ex. 1 at 3-124; see also Recons. Reply at 2. Ms. Musick, through counsel, also filed an opposition to the Department's motion to treat its motion for reconsideration as conceded, acknowledging that the Court had the discretion to treat the motion as conceded, but requesting that the Court not do so.

The Department replied to Ms. Musick's oppositions on October 7, 2010, and then moved, with the consent of Ms. Musick, that the Court continue the trial in this case until the Court resolved the Department's two pending motions.  On November 10, 2010, the Court granted the motion to continue the trial in this case.  Subsequently, on March 3, 2011, the Court denied the Department's motion to treat its motion for reconsideration as conceded and said it would consider the motion for reconsideration on its merits, see Minute Order, March 3, 2011, which it now does.

## II.  LEGAL STANDARD

### A.  Reconsideration

"[T]here is no Federal Rule of Civil Procedure that expressly addresses motions for reconsideration[.]"  Clark v. Feder, Semo & Bard, P.C., 736 F. Supp. 2d 222, 224 (D.D.C. 2010).  Because the Court's Order of October 24, 2007 denying the Department's motion for summary judgment is interlocutory, however, the Department's motion for reconsideration properly is characterized as a motion under Rule 54(b) of the Federal Rules.  See id. at 224-25; see also FED. R. CIV. P. 54(b) ("[A]ny order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the

claims[.]"").  "The Court has broad discretion to hear a motion for reconsideration brought under

Rule 54(b), . . . and reconsideration is appropriate as justice requires[.]"  Clark v. Feder, Semo

& Bard, P.C., 736 F. Supp. 2d at 225 (quotations and citations omitted).

*B.  Summary Judgment*

Summary judgment may be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986);

Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is material if a dispute over it

might affect the outcome of a suit under the governing law."  Holcomb v. Powell, 433 F.3d

at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott

v. Harris, 550 U.S. 372, 380 (2007).

On a motion for summary judgment, the Court will construe the evidence in the

light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006);

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The nonmoving

party's opposition, however, must state more than mere unsupported allegations or denials.  See

FED. R. CIV. P. 56(c)(1)(A) (must cite to particular parts of materials in the record, including

depositions, documents, and affidavits or declarations); Celotex Corp. v. Catrett, 477 U.S. 317,

324 (1986).  If the nonmovant's evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50;

see also Scott v. Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'")

(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.  DISCUSSION

### A.  Reconsideration

Exercising its broad discretion, see Clark v. Feder, Semo & Bard, P.C.,

736 F. Supp. 2d at 225, the Court concludes that justice requires that it reconsider its October 24,

2007 Order denying the Department's motion for summary judgment.  In its previous Order, the

Court found that there were genuine issues of material fact in dispute, and that the Department

was not entitled to judgment as a matter of law.  See Order at 1, Oct. 24, 2007.  Upon further

consideration, and having reviewed again the entire record in this case, the Court concludes that

there are in fact no genuine issues of material fact in dispute.  The Court therefore will grant the

Department's motion for reconsideration and will consider anew the Department's motion for

summary judgment.

### B.  Retaliation

Ms. Musick makes only one claim in this case: she alleges that she was unlawfully

terminated because of her prior participation in protected activity, in violation of Title VII.  See

Compl. ¶¶ 22-26.  The Department disagrees.  It contends that Ms. Musick was terminated for a

legitimate, non-discriminatory reason and not in retaliation for protected activity — that is, that

Ms. Musick made threatening statements of violence about various Department officials.

Title VII makes it unlawful for an employer to "'discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Bright v. Copps, Civil Action No. 08-0755, --- F. Supp. 2d ----, 2011 WL 6123470, at *6 (D.D.C. Dec. 9, 2011) (quoting 42 U.S.C. § 2000e-3(a)).  In order to prevail on a retaliation claim under Title VII an employee must show that "she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." Taylor v. Solis, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quotations omitted).  Thus, the two elements of such a claim are that a plaintiff "'suffered (1) a materially adverse action (2) because he or she had brought or threatened to bring a discrimination claim.'" Bright v. Copps, 2011 WL 6123470, at *7 (quoting Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008)).

Where, as here, direct evidence of unlawful retaliation is lacking, such claims are initially assessed under the three-part burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, a plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by the employer; and (3) a causal connection existed between the protected activity and the materially adverse action.  See Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009); Bright v. Copps, 2011 WL 6123470, at *7.

Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate non-discriminatory, or non-retaliatory reason for its actions.  If the

13

employer does so, "'the burden-shifting framework disappears, and [the court] looks to whether a reasonable jury could infer retaliation from all the evidence,'" including the *prima facie* case, any evidence the plaintiff offers to attack the employer's proffered explanation, and any independent evidence of retaliation. Guajacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Jones v. Bernanke, 557 F.3d at 677); see also Taylor v. Solis, 571 F.3d at 1320. At that point, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jones v. Bernanke, 557 F.3d at 678 (quotations omitted) (alteration in original). And in assessing whether such a material dispute exists, a court must examine all relevant "categories of evidence — prima facie, pretext, and any other — to determine whether they either separately or in combination provide sufficient evidence for a reasonable jury to infer retaliation" so as to defeat summary judgment. Id. at 679 (quotations omitted).

   In this case, the Department has asserted a legitimate, non-discriminatory reason for Ms. Musick's termination. Therefore, as the court of appeals instructs, the only question before the Court is whether Ms. Musick has proffered sufficient evidence to create a material dispute either directly by showing that a discriminatory reason, retaliation for protected activity, more likely motivated the Department or indirectly by showing that the Department's proffered explanation — that Ms. Musick was terminated for making statements of violence toward various Department officials — is unworthy of credence. See Jones v. Bernanke, 557 F.3d 670, 678; see also Murray v. Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005).

Ms. Musick provides two purported bases for showing pretext: (1) she relies on the asserted temporal proximity between her filing of EEO complaints and another lawsuit she brought in this Court in 1997, and the adverse employment action taken against her in December 2001; and (2) she asserts that she never made the alleged statements of violence, and that the Department conducted a biased investigation of the matter because it failed to make her "a real part of the investigation."  MSJ Opp. at 8.  The Court examines the evidence offered by Ms. Musick on these points.

1.  *Prima Facie* Evidence — Ms. Musick's EEO Complaints and Separate Lawsuit in This Court

The Department does not dispute that Ms. Musick engaged in protected activity when she filed EEO complaints from 1993 to 1999 and filed a complaint in this Court in 1997. But the Department argues that the temporal proximity between that protected activity and this case is nonexistent.  As the Department describes it:

> Plaintiff's removal for making statements of violence against [Department] employees, including her supervisor, was effective December 7, 2001, for an incident that occurred on May 1, 2001. . . . [T]here is no temporal connection between the filing of her administrative complaints and District Court Complaint (in 1999 and prior) and her removal in 2001.

MSJ at 8.  In response, Ms. Musick argues that her district court complaint in Civil Action No. 97-0143 "was still being litigated at the time of the adverse action" relevant to this case. MSJ Opp. at 7.  Thus, Ms. Musick argues that there was a causal connection between her protected activity and the retaliatory discharge.

The Court disagrees with Ms. Musick.  To be sure, courts in this district have concluded that "ongoing litigation [is] a statutorily protected activity."  Pendleton v. Holder,

697 F. Supp. 2d 12, 23 (D.D.C. 2010); see Kranz v. Gray, Civil Action No. 09-2043, --- F. Supp.

2d ----, 2012 WL 271308, at *9 (D.D.C. Jan. 31, 2012); Williams v. Dodaro, 691 F. Supp. 2d 52,

55-56 (D.D.C. 2010); see also Lowe v. District of Columbia, 669 F. Supp. 2d at 27 ("Where a

plaintiff suffers retaliation for participation in a lawsuit, the Court must look not only to when the

participation occurred, but when the animosities created by that lawsuit would have ended.").

But see Gladysiewski v. Alleghney Energy, 398 Fed. App'x 721, 724 (3d Cir. Sept. 20, 2010)

("[W]e typically measure temporal proximity from the date of filing rather than from the date a

lawsuit is resolved . . . since the protected activity in which a litigant engages is the filing of a

complaint, not its dismissal by a court.") (quotations and citation omitted).   But a plaintiff does

not automatically maintain temporal proximity throughout the entirety of the litigation.   See

Smith v. Allstate Ins. Corp., Civil Action No. 99-4240, 2001 WL 1104713, at *11-12 (N.D. Ill.

2001) (period between filing a lawsuit and its completion is not "an open time period of

'protected activity'").   Instead, a plaintiff must present at a minimum some evidence that she was

"*actively pursuing* her Title VII litigation" when the adverse action was taken against her.

Williams v. Dodaro, 691 F. Supp. 2d at 56 (emphasis added).

In her papers, Ms. Musick has done nothing more than assert — without any

explanation — that because her prior lawsuit was "pending" at the time of her termination, "[t]he

causal connection was still running at the time."   MSJ Opp. at 4.   Nevertheless, the Court, on its

own initiative, has reviewed the docket sheet in Civil Action No. 97-0143.   It reveals that during

most of the time between January 21, 1997, when the complaint was filed, and November 2001,

Ms. Musick was not actively pursuing her case.   In November of 2001, however, the court set a

briefing scheduling for dispositive motions.   See Musick v. Norton, Civil Action No. 97-0143,

Order at 1 (D.D.C. Nov. 1, 2001).  The defendant filed its motion to dismiss Ms. Musick's

complaint on November 16, 2001; Ms. Musick filed an opposition on January 22, 2002.

As discussed, Ms. Musick was terminated on December 7, 2001, which is during

the time of the dispositive motions schedule set in Civil Action No. 97-0143.  Ms. Musick,

however, did not file her opposition until January 22, 2002 — after her termination — and

appears to have requested a stay of all proceedings in December 2001.  See Musick v. Norton,

Civil Action No. 97-0143, Dkt. No. 105: Notice of Filing by Ms. Musick in Support of Mot. for a

Stay of All Proceedings, Dec. 14, 2001.  But even assuming that Ms. Musick's activity in Civil

Action No. 97-0143 around the time of her termination could constitute active pursuit of her

Title VII litigation, temporal proximity "alone is simply insufficient to discredit [a] defendant's

proffered explanation" for an adverse action.  Kranz v. Gray, 2012 WL 271308, at * 9 (citing

Sewell v. Chao, 532 F. Supp. 2d 126, 139 (D.D.C. 2008) ("[T]emporal proximity . . . standing

alone . . . is insufficient to discredit defendant's proffered explanation[.]")); see Pendelton v.

Holder, 697 F. Supp. 2d at 23 ("Temporal proximity alone . . . is insufficient to rebut" an

employer's proffered explanation for its adverse action.).  As the court of appeals has stated:

"'[P]ositive evidence *beyond mere proximity* is required to defeat the presumption that the

proffered explanations are genuine.'"  Hamilton v. Geithner, 666 F.3d 1344, 1359 (D.C. Cir.

2012) (quoting Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007) (emphasis added)).

Therefore, Ms. Musick's claim of temporal proximity alone is insufficient to discredit the

Department's proffered explanation for her termination.

2.   Pretext Evidence — The Department's Investigation, and the Alleged Threats

Ms. Musick asserts that the Department's reason for her termination was

pretextual, and she contends that there are two genuine issues of material fact in dispute relevant

to this assertion of pretext:

> 1.  Whether or not Defendant conducted a fair and evenhanded
> investigation of the allegations that Plaintiff made threats of
> violence against her co-workers and supervisors.
>
> 2.  Whether or not Plaintiff did, in fact, make threats of violence
> against her co-workers and supervisors.

Pl. SMF at 9 (citations omitted).

As for the first purported genuine issue of material fact, Ms. Musick asserts that

she was "not made a real part of the investigation," which "betrays that the purpose of the entire

process was retaliatory."  MSJ Opp. at 8.  As discussed above, see supra at 5-7, however, Ms.

Musick's statements on this purported issue are inconsistent.  Although Ms. Musick asserts in

her papers that Mr. DeYoung did not interview or otherwise talk with her, MSJ Opp. at 8 (citing

DeYoung Aff. at 55), she provides no affidavit or declaration of her own to that effect, and Mr.

DeYoung's affidavit does not entirely support her assertion.  Mr. DeYoung acknowledges that he

did not formally interview Ms. Musick, but asserts that he did have a brief discussion with her

about the issue.  See DeYoung Aff. at 54-55.  It therefore is undisputed that Mr. DeYoung *did*

talk with Ms. Musick about the alleged incident.

As for the deciding official, Dr. Russ, he asserts that on September 4, 2001 he met

with both Ms. Musick and her attorney at the time, Solaman Lippman, and that he gave Ms.

Musick an opportunity to speak on her own behalf.  See Russ Aff. at 14-15.  Although Ms.

18

Musick appears to claim that Dr. Russ never spoke with her, see MSJ Opp. at 8; Musick Aff

at 40-41, she has made sworn statements to the contrary.  See 3/10/04 Musick Dep. at 110

("I talked to Dave Russ on September 5th of 2001. . . . [He] asked me if I'd made violent threats

against my supervisors at USGS and I said no."); 7/4/04 Musick Dep at 13 ("Q: Do you recall

meeting with Mr. [sic] Ross?  A: Yes.  Q: When did you meet with Mr. [sic] Ross?  A: I believe

it was on September 5th of 2001."); see also 7/4/10 Musick Dep. at 36.  Moreover, in her most

recent filing, Ms. Musick expressly acknowledges that she and Mr. Lippman in fact did attend a

hearing conducted by Dr. Russ, and that she was interviewed at that hearing.  See Recons. Opp.

at 29 ("Sept. 2001, Mr. Lippman and Plaintiff attended a hearing conducted by Dave Russ and

Cathy Skelton . . . . Plaintiff was interviewed in the hearing."); see also id. at 36 (Ms. Musick,

providing a timeline of events, stating: "September 5, 2011, Plaintiff's meeting with Dave Russ

at USGS.").  That position is consistent with Dr. Russ' affidavit, in which he states that he met

with both Ms. Musick and her attorney, and that he gave Ms. Musick an opportunity to speak on

her own behalf.  See Russ Aff. at 14.  Furthermore, it is undisputed that prior to her termination

Ms. Musick and her attorney provided Dr. Russ with a written response in support of their

position that she should not be terminated because she did not make any threatening statements.

See Russ Aff. at 10-11, 14-16; Musick Aff. at 41.  By her own admission, then, Ms. Musick was

given the opportunity to make her case to the deciding official on the matter.  There therefore is

no genuine dispute of material fact that need be resolved concerning the nature and fairness of

the hearing.[5]

_____

[5]      The court of appeals in Brady v. Office of the Sergeant at Arms noted that
employees often try to cast doubt on an employer's asserted reason for its adverse employment
action by pointing to, among other things, "the employer's failure to follow established

With respect to the second purported genuine issue of material fact, Ms. Musick emphasizes that she has "emphatically denie[d]" making threats against Interior Department employees and asserts that this dispute "is the core of the case."  MSJ Opp. at 7.  Whether Ms. Musick in fact made threats of violence is irrelevant.  "The question is not whether the underlying [conduct] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying [conduct] occurred."  Brady v. Office of the Sergeant at Arms, 520 F.3d at 496 (emphasis in original).  And on this issue, Ms. Musick has provided no evidence to create a genuine dispute regarding whether, after thorough investigation, Dr. Russ honestly and reasonably believed that Ms. Musick made threatening statements against Department employees to Ms. Mosgrave.  Because "the employer's stated belief about the underlying facts is reasonable in light of the evidence," there is "no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  Brady v. Office of the Sergeant at Arms, 520 F.3d at 495; see George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given *even though that reason may turn out to be false*.") (emphasis added).

The following facts are undisputed:

(1) Ms. Mosgrave and Ms. Musick had a conversation on May 1, 2001.  See Def. SMF ¶ 11; MSJ Opp. at 4; see also Recons. Mot. at 4 n.2.

---

procedures or criteria[.]"  Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008).  Ms. Musick makes no such claim here.  To the contrary, she expressly acknowledges that "[e]very procedure was properly followed and documented."  MSJ Opp. at 7.

(2) Ms. Mosgrave told Mr. Kaas that Ms. Musick made statements of violence against Department employees during that May 1, 2001 conversation.  Def. SMF. ¶ 15; Pl. SMF (no response).[6]

(3) Ms. Mosgrave then provided to the Department a written statement to that effect, asserting that Ms. Musick repeatedly said she wanted to "blow . . . up" certain Department employees and "see them in their graves."  Def. SMF ¶ 21 (quotations omitted); Pl. SMF (no response).

(4) Mr. DeYoung interviewed Ms. Mosgrave about her statements, Def. SMF. ¶ 23; Pl. SMF (no response), and Mr. Kaas provided a written statement to Mr. DeYoung in which he confirmed the substance of his conversation with Ms. Mosgrave — that is, that Ms. Mosgrave said Ms. Musick had made "threatening statements about causing harm to employees at [the Department]."  Def. SMF ¶ 30 (quotations omitted); Pl. Stmt. (no response).

(5) Dr. Russ performed his own investigation of the matter, and Ms. Musick provided Dr. Russ with a written response drafted with the assistance of her attorney regarding the alleged incident on May 1, 2001.  Def. SMF. ¶ 34; Pl. SMF. (no response).

(6) Dr. Russ interviewed Ms. Musick on September 4 or September 5, 2001.  See supra at 6-7, 18-19; 3/10/04 Musick Dep. at 110; 7/4/04 Musick Dep at 13, 36; Recons. Opp. at 29, 36; Russ Aff. at 14.

(7) Dr. Russ interviewed Ms. Mosgrave and Ms. Kaas, among others, and ultimately decided to terminate Ms. Musick.  Def. SMF ¶¶ 35-36; Pl. SMF (no response).

---

[6]     In her recent 121-page response to the Department's motion for reconsideration, Ms. Musick at one point describes Ms. Mosgrave as "a disinterested third party witness, repeating only what she has heard."  Recons. Opp., Ex. 1 at 19.  But see id. at 30-31.

Ms. Musick has provided no evidence from which a reasonable jury could doubt that Dr. Russ acted in good faith upon his honest belief that Ms. Musick made statements of violence to Ms. Mosgrave.  See Brady v. Office of the Sergeant at Arms, 520 F.3d at 495.  After Dr. Russ interviewed Ms. Mosgrave, he found her to be neutral, credible, and consistent, and he concluded that she truthfully reported to the Department that Ms. Musick had made threats of violence.  See Russ Aff. at 45-47.  Dr. Russ then determined that Ms. Musick's threats were disruptive to the workplace and negatively affected morale and the efficiency of the service and warranted termination.  See Def. SMF ¶¶ 37-39; see also MSJ, Ex. 19 at 2.  It is not the Court's role to dispute the correctness of Dr. Russ's judgment on Ms. Mosgrave's credibility and his factual determination that Ms. Musick did make threats of violence.  See Brady v. Office of the Sergeant at Arms, 520 F.3d at 496 ("Although Brady asserts that the accusations and ensuing investigation were racially tainted and the incident did not occur, he did not produce evidence sufficient to show that the Sergeant at Arms' conclusion was dishonest or unreasonable.").  Therefore, the Court concludes that Ms. Musick has not created a material dispute on the ultimate issue of retaliation, and the Department therefore is entitled to judgment as a matter of law.  See Jones v. Bernanke, 557 F.3d at 678.[7]

---

[7]      The Court notes that there is a letter in the record, included as an attachment to the Department's motion for summary judgment, from Dr. Patrick J. Sheehan to Ms. Musick's former attorney, dated July 16, 2001.  In that letter, Dr. Sheehan asserts that he contacted Ms. Mosgrave, and she told him that Ms. Musick did not "discuss any plan to kill anyone" and "expressed the sentiment that she was being used to get rid of Ms. Musick."  MSJ, Attachment to Ex. 23, Letter from P. Sheehan to S. Lippman at 3-4, July 16, 2001 [Dkt. No. 37-25 at 24-27].  Although the substance of this letter presumably could cast some doubt on Ms. Mosgrave's credibility, neither party referenced it or even cited it in their papers.  Nor does it appear to be a statement given under oath.  The parties have given the Court no reason to conclude that this letter should be given any probative value at the summary judgment stage, and the Court therefore will not consider it.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials[.]").

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant the Department of the Interior's motion for reconsideration, will vacate the Order dated October 24, 2007 denying the Department's motion for summary judgment, and will grant the Department's motion for summary judgment on Count One of Ms. Musick's complaint.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/
PAUL L. FRIEDMAN
DATE:  March 14, 2012                    United States District Judge